UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| ANGELA A. LEWIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:06-CV-402 |
| | ) | |
| REPUBLIC SERVICES OF INDIANA, | ) | |
| LIMITED PARTNERSHIP, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

### I.  INTRODUCTION

Plaintiff Angela Lewis, who is African-American, brings this suit against her former employer, Republic Services of Indiana, Limited Partnership (referred to herein as "Serv-All").[1] (Docket # 1.)  Lewis asserts that she was discriminated against in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2, and 42 U.S.C. § 1981 on the basis of her sex and race when she was denied a promotion from her position of Customer Service Manager to Sales Manager.[2] (Docket # 1.)

On September 11, 2007, Serv-All moved for summary judgment on all claims.[3] (Docket #

_____

[1] Republic Services of Indiana, Limited Partnership has at times in northeastern Indiana operated under the name "National Serv-All" or "Serv-All." (Boccabella Aff. ¶ 2.)

[2] Subject matter jurisdiction arises under 28 U.S.C. § 1331.  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

[3] Also pending is a Motion to Strike (Docket # 36) filed by Lewis, seeking to strike Serv-All's Reply Brief, including Ex. A and Ex. L attached thereto.  In her motion, Lewis first argues that Serv-All's Reply Brief, which numbered thirteen pages in length, violated Local Rule 7.1 because it "uses single spaced typing for more than five (5) full pages of text. . . ." (Pl.'s Mot. to Strike 2.)  In response, Serv-All submitted a reformatted copy of its Reply Brief that is entirely double-spaced and numbers fifteen pages in length, explaining that it used single-spacing in portions of its Reply Brief merely for emphasis, *not* to circumvent the page limitation. (Def.'s Verified Resp. in

25.)  For the following reasons, Serv-All's motion for summary judgment will be GRANTED.

## II.  FACTUAL BACKGROUND[4]

In 2000, Serv-All, a company that provides solid waste collection services, created the position of Customer Service Manager at its Fort Wayne facility.[5] (Boccabella Dep. 174-75; Sherfield Dep. 68, 70.)  Serv-All specifically solicited Lewis, who worked as a customer service representative for a competitor of Serv-All, to apply for the newly-created position. (Lewis Dep. 8-9; Boccabella Aff. ¶ 6.)  Though Lewis had two years of prior experience in retail clothing sales,[6] Lewis submitted a resume for the position that only reflected employment experience related to customer service. (Lewis Dep. 8, 59-60, 155-56; Boccabella Aff. ¶ 6.)

Lewis was interviewed for the position by Bret Boccabella, Serv-All's General Manager, and Vic Wise, Serv-All's Human Resources Manager, a process that focused on her employment

---

Opp'n to Pl.'s Mot. to Strike 2, Ex. A.)  Thus, Lewis's first argument is moot.

Lewis next argues that the Court should strike Appendix A because it is "nothing more than another 18 pages of single spaced argument about the facts," as well as Exhibit L "because [Serv-All] withheld the document from production throughout litigation despite specific discovery requests . . . ." (Pl.'s Mot. to Strike 2, 6.)  These arguments, however, are also moot, as the Court disregarded Appendix A and Exhibit L in its analysis of Serv-All's motion for summary judgment, yet *still* concludes in Serv-All's favor.

Finally, Lewis conclusorily argues in her motion that Serv-All's Reply Brief should be stricken because it raises new arguments. (Pl.'s Mot. to Strike 2-3.)  Yet, Lewis fails to identify with any specificity arguments that Serv-All raised for the first time in its Reply Brief, (*see* Pl.'s Mot. to Strike 2-3), nor does the Court note any new arguments in its own review.  Therefore, Lewis's final argument is meritless.

As a result, Lewis's Motion to Strike (Docket # 36) will be DENIED AS MOOT.

[4] For summary judgment purposes, the facts are recited in the light most favorable to Lewis, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  Insofar as Lewis does not controvert the facts asserted by Serv-All in its "Statement of Material Facts," those facts "are admitted to exist without controversy" as set forth below. *See* N.D. Ind. R. 56.1.

[5] Serv-All states that Lewis has been its one and only Customer Service Manager, explaining that it did not fill the position after Lewis's resignation and that the duties were instead assigned to the Sales Manager, which was how Serv-All operated before ever creating the position. (Boccabella Dep. 105-06, 174-75; Sherfield Dep. 68-70.)

[6] Lewis managed a Chess King clothing store from 1990 to 1992, which apparently is her only experience in sales prior to joining Serv-All. (Lewis Dep. 59, Ex. 8.)

experiences related to customer service;[7] in fact, since the job was customer-service oriented, neither Boccabella nor Wise asked Lewis about any prior employment experience in the area of sales. (Lewis Dep. 8-9, 155-56.)  Ultimately, Lewis was awarded the job of Customer Service Manager. (Lewis Dep. 8-9; Boccabella Aff. ¶ 6.)

### A. Lewis's Duties

Lewis's duties as Customer Service Manager included managing a customer service center consisting of between five and eight employees who fielded customer calls and handled customer complaints. (Lewis Dep. 13, 34-36, 61, 114, Ex. 14; Lewis Aff. ¶ 6.)  She also generated all sales reports due to her proficiency with the Serv-All computer systems. (Lewis Dep. 30, 34-36, 114; Eshcoff Dep. 40-42, 44.)  It is undisputed that Lewis performed well in the position of Customer Service Manager. (Boccabella Dep. 114-15.)

In fact, not long after she started the job, Boccabella assigned Lewis the additional duties of Inside Sales Manager, which were previously part of the Sales Manager's responsibilities.[8] (Lewis Dep. 12-13, 30; Boccabella Dep. 98-99; Hornberger Dep. 19-20, 23-24; Lewis Aff. ¶¶ 7, 8.)  Consequently, for several years Lewis supervised three Inside Sales Representatives in addition to her duties as Customer Service Manager.[9] (Lewis Aff. ¶ 9.)

In that same vein, throughout her tenure at Serv-All, Boccabella often assigned Lewis job duties that she thought were included in the job requirements of other Staff and that had nothing

---

[7] Wise resigned as Human Resources Manager in 2002 and was succeeded in the position by Mike Sherfield. (Sherfield Dep. 13, 64; Boccabella Aff. ¶ 30.)

[8] Boccabella eventually relieved Lewis of the duties of Inside Sales Manager when Tom Eshcoff, a white male, became Sales Manager, shifting the duties to Eshcoff. (Lewis Dep. 13-14; Lewis Aff. ¶ 10.)

[9] Lewis did not receive an increase in pay for performing these additional duties. (Lewis Aff. ¶ 11.)

to do with customer satisfaction. (Etherington Dep. 11-19, 24, 27-28, 50, 69-74.)  In addition, Boccabella at times consulted Lewis when racial issues arose, seeking her counsel as to how he should respond to such situations. (Lewis Dep. 40-44.)

Nonetheless, though Lewis occasionally accompanied a sales representative on an outside sales call to help secure the sale, she never had any responsibility at Serv-All for directing outside sales representatives or leading outside sales calls, which consume approximately forty percent of a Serv-All Sales Manager's time. (Lewis Dep. 14-15, 58; Boccabella Dep. 78-79, 84; Hornberger Dep. 8, 14-15.)

### B. The "Staff"

As Customer Service Manager, Lewis was a member of the small group of upper-level managers designated as "Staff" at Serv-All. (Boccabella Aff. ¶ 9; Lewis Dep. 24-27.)  The Staff met on a weekly basis with Boccabella to discuss each department and to receive his direction. (Boccabella Aff. ¶ 9; Lewis Dep. 24-27.)  As Staff, Lewis was "at the same level" as the Sales Manager and all of the other management team members, with the exception of the General Manager and the Assistant Manager. (Lewis Dep. 27; Eshcoff Dep. 58.)  Like the other Staff, Lewis reported directly to Boccabella and had authority to hire and fire employees. (Lewis Dep. 64; Boccabella Dep. 21.)  Lewis was the only racial minority employee on the Staff throughout her employment with Serv-All, and after 2002 she was the only female Staff member. (Boccabella Dep. 104, 109; Etherington Dep. 86; Lewis Dep. 147.)  In fact, since Lewis's departure, no African-American has served as Staff at Serv-All. (Boccabella Dep. 104, 109; Etherington Dep. 86; Lewis Dep. 147.)

*C.  The Sales Manager Position Opening*

The position of Sales Manager opened in March 2005 when Tom Eshcoff resigned. (Eshcoff Dep. 46-48, 61.)  Notice of the vacancy was made known at Serv-All and within its related entities. (Sherfield Dep. 26, 70; Boccabella Dep. 32-33.)  Prior to posting the notice of the open position, Mike Sherfield, the Human Resources Manager who succeeded Wise, revised the job description for the Sales Manager position, though he cannot recall what particular changes he made. (Sherfield Dep. 71-74; Boccabella Dep. Ex. 4.)  In any event, it is undisputed that the revised job description of Sales Manager required outside sales experience. (Boccabella Dep. Ex. 4; Sherfield Dep. 71-79.)

Boccabella informed Lewis of the opening and encouraged her to apply for it, not knowing at the time who else would apply. (Lewis Dep. 63-65; Boccabella Aff. ¶¶ 23, 25-26.) In fact, Lewis recalls Boccabella stating that she was "more than qualified for the position." (Lewis Dep. 63-65.)  Likewise, Carl Hornberger, Serv-All's Area Sales Manager, stated that Lewis would be a "natural" for the Sales Manager position. (Wise Aff. ¶ 7.)  In fact, in answer to Lewis's interrogatories, Serv-All seemingly admitted that Lewis was qualified for the Sales Manager position. (Boccabella Dep. Ex. 1 at 8.)  In any event, Lewis indicated to Serv-All an interest in the position. (Lewis Dep. 64-65.)

Eventually, Sherfield asked Lewis to submit a resume for consideration for the Sales Manager position, giving her less than twenty-four hours within which to do so. (Lewis Aff. ¶ 15.)  Lewis had not expected that she would need to submit a resume for the position since Eshcoff was previously considered for the job without submitting his resume, even though there were other candidates at the time. (Eshcoff Dep. 20-21; Lewis Dep. 60, 68, 143, 152; Lewis Aff.

¶¶ 15, 16.)  As a result, the resume that Lewis submitted to Sherfield was prepared in a hurry and omitted her prior sales experience at Chess King. (Lewis Aff. ¶ 18; Lewis Dep. 65, 68-70, Ex. 8.)

Serv-All's selection process for the Sales Manager position was two-fold. (Boccabella Aff. ¶ 16.)  The first step was an interview with some combination of Hornberger as Area Sales Manager, Boccabella as General Manager, and Sherfield as Human Resources Manager. (Boccabella Dep. 42-43.)  Finalists were then selected to proceed to the second phase, which consisted of interviews with Staff and Boccabella. (Boccabella Aff. ¶ 16.)  Boccabella, however, made the final decision about who was interviewed and who was ultimately awarded the position. (Boccabella Dep. 87-88; Sherfield Dep. 27-28.)  Lewis acknowledges that no one ever indicated that she would be the sole candidate for the Sales Manager position; others expressing interest in the position ultimately included Mark Richmond, Tom Lalevich, and Tom Lawson, all white males.[10] (Boccabella Aff. ¶ 14; Lewis Dep. 72.)

Boccabella conducted an initial interview of Richmond but concluded that he was not a fit for the position. (Boccabella Aff. ¶ 25; Sherfield Dep. 40; Boccabella Dep. 40-42.) Boccabella also conducted an initial interview of Lalevich, noting particularly Lalevich's experience in retail sales. (Boccabella Dep. 50-51, 86, 92; Anderson Aff. Ex. DEF 1 0249; Boccabella Aff. ¶ 16; Lewis Dep. 59-60, 155-56.)  In addition, Boccabella conducted an initial interview with Lawson, who worked for a sister operation of Serv-All, had won the 2004 Chairman Circle's Award, and had over ten years of experience in both outside sales and in

---

[10] Though additional candidates (all males of unknown race) were referred for the position from an outside recruiting company, Boccabella did not interview or consider them, even though one of them had experience in outside sales in the waste industry. (Boccabella Dep. 62-64, 194-95; Sherfield Dep. 29-30, 41-44, 81-82; Boccabella Aff. ¶ 14.)

managing outside sales representatives in the waste industry.[11] (Anderson Aff. Ex. DEF 1 0236; Boccabella Aff. ¶ 24.)  Boccabella decided to allow Lawson and Lalevich to proceed to the second phase of the interview process. (Boccabella Aff. ¶ 16.)

Because Lewis directly reported to him, Boccabella asked Hornberger to be involved in Lewis's introductory interview. (Boccabella Dep. 45-46; Boccabella Aff. ¶ 15.)  Lewis recalls plans to interview her on three occasions; she thinks that the initial interviewing of the other candidates occurred while she was on vacation in late April/early May 2005. ((Lewis Dep. 73; Boccabella Dep. 44-45, 144.)  After she returned from vacation, Lewis's initial interview was set for mid-May; nonetheless, Lewis was informed that it needed to be rescheduled, apparently because Serv-All was busy working on a City bid. (Lewis Dep. 73.)  Then, in mid-June, Hornberger called Lewis and asked if she would be able to interview that same day; Lewis declined an interview on such short notice, and they set the interview for the following day so that she had adequate time to prepare. (Lewis Dep. 73.)  The next day, Hornberger called and indicated that he would be late for the interview. (Lewis Dep. 73-74.)

By this time, Lawson had undergone the second phase of the interview process, and Boccabella had concluded that Lawson's background was the best match for the Sales Manager position. (Boccabella Aff. ¶¶ 19-20.)  Therefore, in light of the scheduling difficulties with Lewis's interview, Boccabella decided that it was not necessary to formally interview Lewis since he worked with her every day and knew her qualifications. (Boccabella Aff. ¶¶ 19-20.)  Instead, Boccabella met with Lewis and told her that she would not be advancing in the

---

[11] Each year, Chairman's Circle Awards are given to an elite number of sales performers with Serv-All and its related entities for outstanding sales effectiveness and productivity. (Boccabella Aff. ¶ 24.)

interview process and that he would be extending an offer to Lawson. (Boccabella Aff. ¶ 20; Boccabella Dep. 47.)  During the meeting, Boccabella explained to Lewis that the key point differentiating her and Lawson was Lawson's outside sales experience and sales management experience.[12] (Boccabella Aff. ¶ 20; Sherfield Dep. 83; Lewis Dep. 72-76, 90-91.)  Boccabella states that he would only consider a candidate for the Sales Manager position without this type of experience if qualified candidates with outside sales experience were unavailable. (Boccabella Aff. ¶ 21.)

Boccabella then extended an offer of the Sales Manager position to Lawson. (Boccabella Dep. 56, 70.)  Approximately six months later, Lewis voluntarily terminated her employment with Serv-All, having already secured other employment. (Lewis Dep. 11-12.)

### D.  Lewis's Other Evidence of Alleged "Racially and Sexually Disparate and Hostile Treatment"

In her EEOC charge, Lewis complained only of Serv-All's decision not to promote her, stating that the earliest alleged act of discrimination was in June 2005. (Lewis Dep. 109, Ex. 3.)  In fact, Lewis never used Serv-All's internal issue resolution process or its 1-800 AlertLine to report any disparate and hostile treatment that she allegedly experienced at Serv-All.[13] (Lewis Dep. 55; Boccabella Aff. ¶ 4.)  Nonetheless, she now describes a litany of events that purportedly occurred during her time at Serv-All in an effort to show that she was subject to

---

[12] During the meeting, Boccabella also told Lewis that two managers above his level told him that she was not ready for the job, but that if she was interested in such a position, they would facilitate a development plan to help prepare her for the job in the future. (Boccabella Dep. 47.)  In addition, Boccabella stated that he was aware of a customer service position with additional responsibilities at a Serv-All facility in Indianapolis that could be considered a promotion and that someone would be calling Lewis from Indianapolis to see if she was interested in that position. (Boccabella Dep. 48.)

[13] Serv-All encourages its employees to use its internal resolution process or to advance complaints through its 1-800 Alertline. (Lewis Dep. 54; Boccabella Aff. ¶ 4.)

"racially and sexually disparate and hostile treatment" throughout her employment:

1. <u>Compensation of Female Staff</u>.  Lewis states that she was paid "substantially less" than all of the other Staff, receiving a supervisory-level pay rate rather than a management-level pay rate.[14] (Etherington Dep. 97-98; Boccabella Dep. 196-97.)  In fact, both Lewis and Molly Etherington,[15] the only other female Staff during Lewis's tenure, believe that Serv-All paid all of the white male Staff significantly more than it paid either of them, even though Lewis and Etherington each had college degrees and several of the white male managers did not. (Etherington Dep. 97-98; Boccabella Dep. 196-97.)

Also, Lewis complains that Boccabella placed her on a ten percent bonus plan, which had been created for non-supervisory white male Staff, rather than the twenty percent bonus plan that all of the other white male Staff who managed subordinate employees received. (Boccabella Dep. 170-71, 197, 199-203, Ex. 10, Ex. 19.)

2. <u>Boccabella's Treatment of Lewis and Other Female Staff</u>.  During her tenure with Serv-All, Boccabella assigned Lewis various job duties that she thinks belonged to other white male Staff and that had nothing to do with customer satisfaction, such as requiring her to be backup for accounting in the billing area. (Etherington Dep. 9, 11-19, 24, 27-28, 50, 69-74; Lewis Dep. 30, 115.)  She also thinks that Boccabella allowed lower-level white male supervisors to ignore her requests for necessary information, requiring her instead to seek the

---

[14] Though Boccabella and Wise agreed upon Lewis's starting salary, Wise unilaterally increased Lewis's starting salary within two weeks after Lewis's start date; Boccabella, however, denies any knowledge as to this salary increase or Wise's motivation for doing so. (Boccabella Dep. 198-99, Ex. 18.)

[15] Etherington served as Controller of Serv-All from 1998 to 2002. (Lewis Dep. 28; Etherington Dep. 35-38.)

information through alternate channels. (Lewis Dep. 19-23.)  In addition, Lewis perceives that

Boccabella did not require that white male managers show Lewis the same respect he demanded

be shown to white male managers and that during Staff meetings Boccabella allegedly treated

Lewis differently and less favorably than the white males in the room. (Lewis Dep. 24, 30, 34-

35, 65, 114-15, 128; Etherington Dep. 10-19, 24, 27, 43, 50, 61-63, 69-74, 78, 112-13, 118.)

Moreover, Lewis thinks that Boccabella required more work from her, was harsher to her, and

held her "a lot more accountable than any other department." (Lewis Dep. 24-36; Etherington

Dep. 14-15, 10-19, 24, 27, 50, 61-63, 69-74, 112-13, 118.)

     Nonetheless, Lewis testified: "[Boccabella] did give me more responsibilities, and he

gave those responsibilities, I believe, based on the fact that he knew that I could do the work."

(Lewis Dep. 31.)  In that vein, Lewis does not recall being delegated any responsibilities that she

was unable to perform. (Lewis Dep. 32-33.)  In fact, Etherington testified that she did not think

that Boccabella mistreated Lewis because Lewis was African-American or female. (Etherington

Dep. 23-26, 43.)  Rather, Etherington thought Boccabella relied upon Lewis for many tasks

because she was "very smart and very resourceful" and that Boccabella did not have the same

confidence in some of his other employees. (Etherington Dep. 14-15, 71.)

     As to Etherington's experience at Serv-All, she also thought that Boccabella required her

to work harder than the male Staff. (Lewis Dep. 31; Etherington Dep. 16, 27-29, 50-52.)  For

example, when Etherington served as Controller, she had no assistant; yet, when Kirk York, a

white male, was hired to replace her as Controller after she voluntarily left the position, he was

provided an assistant. (Etherington Dep. 31-32, 36-38.)  Only after Etherington complained

about the disparate work load and significantly higher pay that York received for doing less

work did Boccabella shift some of her responsibilities to York. (Etherington Dep. 86-87, 94.)  In addition, Etherington states that Boccabella required her to work from home six to seven hours a day for five to six weeks during one of her maternity leaves, never requiring any white male manager to work during his leave time. (Etherington Dep. 20-22, 70.)  Moreover, following one of Etherington's maternity leaves, Boccabella secretly assigned another employee to monitor her work hours, and York imposed a daily record-keeping requirement on Etherington that no other employee was required to maintain. (Etherington Dep. 58, 100-01.)  When Etherington complained to other male Staff of the alleged disparate treatment by York, they simply told her that York was her boss and that she needed to "suck it up."[16] (Etherington Dep. 103-04.)

Nonetheless, Etherington does not recall Boccabella giving her assignments that she thought were outside of her job duties, and she never applied for a position at Serv-All that she did not get. (Etherington Dep. 69, 114.)  Like Lewis, Etherington never complained to Serv-All about alleged discrimination and did not call the 1-800 Alertline to lodge any complaints of discrimination. (Etherington Dep. 48, 114-15.)

As additional evidence of purported discrimination, Lewis and Etherington state that when either of them missed a weekly Staff meeting, they were required to find another employee to attend in their place; yet, when a white male missed a Staff meeting, he was not required to send a designee. (Etherington Dep. 67, 82-83; Lewis Aff. ¶ 14.)  In that same vein, all of the white male Staff were invited to attend the annual company meeting held in Florida; however, Lewis was never invited to any of the annual meetings in Florida, not even the year in which

---

[16] When asked whether she felt York discriminated against her, Etherington answered: "Most definitely." (Etherington Dep. 101.)  However, upon further inquiry, Etherington denied that York was motivated by her gender, instead confiding: "I think [York] just didn't like me." (Etherington Dep. 101.)

Serv-All won the Customer Service Award.[17] (Etherington Dep. 108-09.)  Moreover, though

Lewis complains that she was never invited to any of Serv-All's annual golf outings, Etherington

did attend the event for several years. (Etherington Dep. 107; Lewis Aff. ¶ 13.)

    3.  <u>Remarks by Boccabella and Sherfield</u>.  Lewis fails to identify anything that

Boccabella said to her that she thought was sexist or discriminatory. (Lewis Dep. 38.)  However,

she reports hearing Boccabella refer to Etherington as an "ice princess" when communicating

directly with Etherington and in general discussions with other Staff. (Lewis Dep. 39;

Etherington Dep. 56.)  In addition, Etherington states that Boccabella called Etherington a "man-

hater" at least once a month even though she repeatedly asked him not to do so.[18] (Etherington

Dep. 86-87.)

    When Lewis wore a black leather vest provided to her by Serv-All, Sherfield told her that

she looked like a "gangster"; when Lewis asked Sherfield what he meant by the statement, he did

not respond. (Lewis Dep. 51.)  Lewis also heard Sherfield refer to Etherington as the "ice

princess." (Lewis Dep. 51.)  Moreover, Sherfield made an allegedly gender discriminatory

comment to one of Lewis's female employees, and the employee reported it to Boccabella; yet,

Boccabella never reprimanded Sherfield for his inappropriate comment. (Lewis Aff. ¶ 19;

Sherfield Dep. 61.)

    4.  <u>Serv-All's Handling of Employees' Complaints of Racial Discrimination</u>.  Lorine

Coats, an African-American female who held an Inside Sales Representative position under

---

[17] Boccabella states, apparently without dispute, that he does not have any control over who gets invited to the annual meetings; in fact, Boccabella does not recall seeing any customer service managers, male or female, at these meetings. (Boccabella Dep. 188-89.)

[18] Boccabella denies that he ever referred to Etherington as an "ice princess" or "man-hater." (Boccabella Dep. 151.)

Eshcoff, complained to Boccabella and Sherfield on at least two different occasions of purported

racially and sexually discriminatory treatment by Eshcoff, yet Boccabella and Sherfield deny any

knowledge of these complaints.[19] (Coats Dep. 17, 21, 23, 27-28, 31, 42-46, 70-72; Sherfield Dep.

25, 90; Boccabella Dep. 18, 150-51.)

When Lewis complained about an allegedly racist comment made by one of her

employees, Serv-All told her that the employee would be required to attend diversity training.

(Lewis Dep. 46-50.)  Yet, Serv-All never required the employee to attend the training. (Lewis

Dep. 49-50.)

In November 2004, Robert Taylor, the only other African-American supervisor at Serv-

All, received an anonymous note on his car at about the same time that he was terminated.

(Boccabella Dep. 163-64.)  The note was addressed "to the general manager" and thanked the

general manager for "getting the colored out" and stating that "we hope you will find a plan for

the last one left to get out"; Lewis perceived the note was a clear reference to her. (Lewis Dep.

159; Sherfield Dep. 92-93; Boccabella Dep. 160, Ex. 8.)  Though Boccabella thereafter

---

[19] Coats received several promotions during her six-year tenure, as she started as a Customer Service Representative, was promoted to an Inside Sales Representative, and was then promoted to a Sales Coordinator. (Coats Dep. 6.)  Nonetheless, Coats thinks she was denied certain other positions that she should have been awarded and that she should have been promoted to Sales Coordinator earlier. (Coats Dep. 12.)

More specifically, the first time Coats applied for the Human Resources Assistant position, she was in the process of finishing her college degree, and the job description required a college degree; Sherfield ultimately selected a candidate who had a Master's degree. (Coats Dep. 12-14, 46.)  Coats applied for the same position after receiving her degree; however, the job description had been changed to no longer require a degree. (Coats Dep. 12-14, 46.)  Sherfield then hired a white female who did not have a college degree to fill the position because she had more human resources experience than Coats. (Coats Dep. 12-14, 46.)  When Coats was later passed over for yet another position for which she applied, Sherfield and Eshcoff both told Coats that the chosen candidate had a Master's degree, which was not a job requirement but could not be overlooked in making a hiring decision. (Coats Dep. 59.)  In any event, when Coats applied for the Sales Coordinator position the second time, she was awarded the position. (Coats Dep. 20.)

In sum, while she complains that she should have been promoted earlier, Coats denies that there were any other instances in which she thought that she was discriminated against at Serv-All. (Coats Dep. 24.)  Moreover, Coats does not think that Boccabella or Sherfield ever treated her or Lewis, or anyone else for that matter, unfairly because of gender. (Coats Dep. 93-94.)

cautioned Lewis about working late for safety reasons, Lewis criticizes Boccabella because he did not attempt to identify and confront the author of the note. (Lewis Dep. 159; Boccabella Dep. 159-67; Sherfield Dep. 92-96.)  Yet, upon Lewis's suggestion and as a result of the note, Boccabella brought in an outside consultant to conduct diversity training with management and supervisory staff, and the Human Resources Manager then trained the entire workforce. (Lewis Dep. 43; Sherfield Dep. 98.)

### III.  STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne*, 337 F.3d at 770.  When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.*  The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).  If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770.  A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as  "summary judgment cannot be used to resolve swearing contests between litigants." *Id.*  However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

14

# IV. DISCUSSION

## *A.  Applicable Law*

A plaintiff alleging employment discrimination under Title VII can contest summary judgment by using either the direct or indirect method of proof. *Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007).  The direct method requires the plaintiff to produce enough evidence, either direct or circumstantial, "that could permit a reasonable jury to conclude that the employer acted with discriminatory intent . . . ." *Id.*

The indirect method is the well-known *McDonnell Douglas* burden-shifting framework. *See, e.g.*, *id.*  Here, the plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  In order to establish a prima facie case in a failure-to-promote context, the plaintiff must show that "1) [s]he belongs to a protected class, 2) [s]he applied for and was qualified for the position sought, 3) [s]he was rejected for that position and 4) the employer granted the promotion to someone outside of the protected group who was not better qualified than the plaintiff." *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003); *see also Sublett v. John Wiley & Sons, Inc*., 463 F.3d 731, 737 (7th Cir. 2006); *Millbrook v. IBP, Inc*., 280 F.3d 1169, 1174 (7th Cir. 2002).  If the plaintiff successfully establishes a *prima facie* case, the burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802.  Once the defendant has done so, the burden shifts back to the plaintiff

15

to show that the proffered reason is merely a pretext for discrimination.[20] *Id.* at 804.

### B.  Lewis's Discrimination Claims Fail Under the Direct Method

Here, Lewis seeks to avert summary judgment under the direct method by presenting enough circumstantial evidence to compose "a convincing mosaic of discrimination against the plaintiff."[21] *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994).  "Circumstantial evidence demonstrating intentional discrimination includes: '(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.'" *Lewis v. City of Chicago*, 496 F.3d 645, 652 (7th Cir. 2007) (internal quotations marks and citation omitted); *see also Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007); *Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007).  Put another way, Lewis must produce evidence from which a rational trier of fact could reasonably infer that Serv-All made the decision not to offer her the Sales Manager position because of her gender or race. *Bell v. E.P.A.*, 232 F.3d 546, 554 (7th Cir. 2000) (citing *Troupe*, 20 F.3d at 737).

---

[20] The Seventh Circuit Court of Appeals generally have applied the same *prima facie* requirements to discrimination claims brought under Title VII and Section 1981. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403 (7th Cir. 2007) (collecting cases).

[21] Lewis does not argue that she has direct evidence of discrimination, which "usually requires an admission by the decisionmaker that [her] actions were based on" the protected status – in this instance, Lewis's race or gender. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 321 (7th Cir. 2003); *see Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002) (holding that direct evidence of discrimination is "evidence that establishes [discrimination] without resort to inferences from circumstantial evidence . . . ."), *cert. denied*, 537 U.S. 879 (2002).

1. Suspicious Statements

Lewis produces some evidence that falls within the first type of circumstantial evidence – suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group.  Though Lewis concedes that Boccabella never said anything directly to her that she thought was sexist or discriminatory, Lewis contends that Boccabella occasionally referred to Etherington as an "ice princess" and a "man-hater." (Lewis Dep. 39; Etherington Dep. 56, 86-87.)

Nonetheless, these references with respect to Etherington, even if Boccabella uttered them, constitute no more than "stray remarks," rather than evidence of  Boccabella's thought process with respect to the Sales Manager position. *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006).  To explain, there is no temporal proximity between these remarks and Boccabella's employment decision as Etherington left Serv-All six months before Boccabella filled the Sales Manager position; moreover, the remarks have nothing to do with the employment decision at issue. *See Hemsworth*, 476 F.3d at 491 (stating that "a particular remark can provide an inference of discrimination when the remark was (1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action"); *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 724 (7th Cir. 1998) (concluding that a comment made five months prior to employee's termination was not temporally related to the employment decision).  "[Derogatory] comments cannot defeat summary judgment in favor of an employer unless they are both proximate and related to the employment decision in question." *Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1293 (7th Cir. 1997).

17

2. <u>Systematically Better Treatment</u>

Lewis also contends that she has produced evidence that falls within the second type of circumstantial evidence – that similarly situated employees outside the protected class received systematically better treatment.  On that score, Lewis explains that she and Etherington purportedly had to work harder, received less respect, and were held more accountable than male Staff.

Lewis's conclusory assertions, however, are far from persuasive, as she admits that she thought Boccabella gave her more responsibilities because "he knew [she] could do the work" and that Boccabella did not have the same confidence in his other Staff. (Lewis Dep. 31.)  The Seventh Circuit Court of Appeals has stated that "circumstantial evidence . . . must point *directly to* a discriminatory reason for the employer's action." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004) (emphasis added)).  Yet, here Lewis's own testimony points directly to her competent performance, not her race or gender, as the reason for Boccabella's alleged high expectations. *See generally Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1571 (7th Cir. 1989) ("The employee doesn't get to write [her] own job description.  An employer can set whatever performance standards he wants, provided they are not a mask for discrimination on forbidden grounds such as race or [gender].").  In fact, Etherington even stated that she did not think Boccabella mistreated Lewis because of her gender or her race, but rather that he assigned Lewis more work because she was "very smart and very resourceful."[22] (Etherington Dep. 14-15,

---

[22] As to her own direct supervisor, Etherington also conceded that she thought York's alleged discriminatory treatment of her was not motivated by gender, but instead that "he just didn't like [her]." (Etherington Dep. 101.)  Moreover, as to Etherington's assertion that Boccabella and York treated her less favorably by monitoring her work hours, this evidence is meritless as it lacks temporal proximity or connection to Boccabella's decision to hire Lawson over Lewis.

18

43, 71.)  In that same vein, Coats testified that Boccabella never treated Lewis, or anyone else for that matter, unfairly because of gender. (Coats Dep. 93-94.)

As to Lewis's contention that her exclusion from Serv-All's annual meeting constitutes circumstantial evidence of discrimination, it is undisputed that Boccabella has no control over who gets invited to the annual meetings and that he does not recall seeing any customer service managers, male or female, at these meetings.[23] *Cf. Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 861 (7th Cir. 2007) (stating that direct evidence typically "relate[s] to the motivation of the decisionmaker *responsible for* the contested decision") (emphasis added). Thus, this evidence simply sheds no light on Boccabella's thought process with respect to the Sales Manager position.

Not to be deterred, Lewis also makes much of the fact that she and Etherington were paid less than the other male Staff in an effort to establish that employees outside of the protected class received systematically better treatment.  Yet, the record is somewhat scant on this issue. To elaborate, Lewis has not pointed with sufficient particularity to a similarly-situated Staff outside of the protected class who was paid more, and a similarly-situated individual is not necessarily apparent in the record since she was Serv-All's first and last Customer Service Manager. *See generally Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965 (7th Cir. 2004) ("To be similarly situated to another employee, [the plaintiff] must show that the employee is directly comparable in all material respects.").

---

[23] Furthermore, Coats's conclusory contention that she should have received a promotion earlier has no connection to Boccabella, the decision-maker with respect to the Sales Manager position.  Lewis has produced no evidence that suggests Boccabella was involved in Coats's various promotions; rather, Lewis's allegations center on the actions of Sherfield and Eschcoff, who had no decision-making authority with respect to the Sales Manager position.

19

In that same vein, no salaries with job titles, much less statistical comparisons, are evident in the record. *See Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003) (finding insufficient circumstantial evidence of discrimination and commenting that "[defendant's] record of disciplining and promoting African-Americans could have been verified by empirical evidence, but it was not."); *see generally Bell*, 232 F.3d at 553 ("In a pattern and practice disparate treatment case, statistical evidence constitutes the core of a plaintiff's prima facie case."); *but see Bruno v. W.B. Saunders Co.*, 882 F.2d 760, 767 (3rd Cir. 1989) (stating that "in individual disparate treatment cases . . ., statistical evidence, which may be helpful, though ordinarily not dispositive, need not be so finely tuned" (internal quotation marks and citation omitted)).

Furthermore, even if Lewis and Etherington had lower salaries than other male Staff, Lewis has pointed to no evidence inferring that Boccabella *actually desired* to pay women less than men. *See generally Ghosh v. Ind. Dept. of Envtl. Mgmt.*, 192 F.3d 1087, 1094 (7th Cir. 1999) (stating that when advancing a wage discrimination claim under Title VII, a plaintiff must show intent to discriminate, that is, she must establish that the pay disparity resulted from the defendant's "actual desire" to pay her less than male employees).  On that score, Lewis earned a higher salary at Serv-All than she did at her previous employer. (Boccabella Aff. ¶ 7.) Furthermore, Etherington testified that she thought she received fair pay while working at Serv-All. (Etherington Dep. 54.)  In sum, the evidence fails to support a reasonable inference that Lewis was paid less because she was female or African-American or, for that matter, that Boccabella rendered systematically better treatment to employees outside of the protected class.

20

3. Pretext

Finally, Lewis purports that she has presented circumstantial evidence consisting of the third general type – that she was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.[24] Serv-All does not necessarily dispute that Lewis was qualified for the position; rather, Boccabella explains that he simply thought Lawson was *more* qualified than Lewis. (Def.'s Reply in Supp. of Its Mot. for Summ. J. 11.)

The focus of a pretext inquiry is "whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006) (quoting *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000)); *see also Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006) ("[T]he question in a discrimination case is not whether the employer's stated nondiscriminatory ground for the action of which the plaintiff is complaining is correct but whether it is the true ground of the employer's action rather than being a pretext for a decision based on some other, undisclosed ground."). Simply put, pretext is "a deliberate falsehood." *Forrester*, 453 F.3d at 419.

Here, Lewis has produced no evidence that suggests Boccabella's proffered reason for his employment decision is a lie.  More specifically, the evidence of record "does not establish that [Lewis] was so clearly superior to [Lawson] that no reasonable person exercising impartial judgment could have made the same decision that [Boccabella] did." *Holmes v. Potter*, 384 F.3d 356, 361-62 (7th Cir. 2004) (citing *Millbrook*, 280 F.3d at 1180-81).  Instead, the evidence

---

[24] The Seventh Circuit Court of Appeals has stated that the third type of circumstantial evidence "bears an eerie similarity to the evidence required under the indirect method." *Volovsek v. Wis. Dept. of Agric., Trade & Consumer Prot.*, 344 F.3d 680, 690 (7th Cir. 2003).

supports only one reasonable inference – that Boccabella honestly believed that Lawson, who had over ten years of experience in outside sales and sales management in the waste industry, was more qualified for the Sales Manager position than Lewis, who had two years of sales experience in a retail clothing store.[25] *See generally Balderston*, 328 F.3d at 323 (articulating that the plaintiff's "own belief that [s]he was the best candidate is irrelevant to the question of pretext"); *Rabinovitz v. Pena*, 89 F.3d 482, 487 (7th Cir. 1996) (finding that, though the plaintiff was qualified for the promotion, the record lacked sufficient support for the proposition that the plaintiff was "so much more qualified that the other candidates that discrimination likely entered the decisionmaking process").  The Seventh Circuit Court of Appeals has repeatedly stated that it does not "sit as a super-personnel department that reexamines an entity's business decisions." *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004); *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, (7th Cir. 1998) ("This court does not examine [the defendant's] business decisions; instead, our job is to determine whether the employer gave an honest explanation of its behavior." (internal quotations marks and citation omitted)).

Moreover, it is particularly difficult to square Lewis's contention of pretext with Boccabella's initial recruitment and hiring of Lewis as Customer Service Manager and his encouragement of Lewis to apply for the Sales Manager position.  In fact, Lewis's bald assertion that Serv-All "deliberately buried its head in the sand about [her] qualifications and then used its self-imposed ignorance as an excuse to claim that Lawson was better qualified" is particularly weak. (Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. ("Resp. Br.") 10.)  Lewis is the only one

---

[25] Similarly, Sherfield identified a legitimate, non-discriminatory basis for selecting another (apparently female) applicant over Coats in each of the instances that Coats describes, and Lewis fails to offer any evidence that suggests these reasons were pretextual.  Moreover, Coats's ultimate promotion to Sales Coordinator by Sherfield serves to diminish any persuasiveness of her conclusory contentions.

at fault for omitting her outside sales experience on the resume she submitted for the Sales
Manager position.

At the end of the day, Serv-All is quite accurate when it states that "'[t]his is yet another
case in which the plaintiff appears to have simply collected the sum total of all the unpleasant
events in her work history . . ., dumped them into the legal mixing bowl of this lawsuit, set the
Title VII-blender to puree and poured the resulting blob on the court.'" (Opening Br. 28 (quoting
*Davis v. Con-Way Transp. Cent. Express, Inc*., 368 F.3d 776, 782 (7th Cir. 2004) (internal
quotation marks and citation omitted))); *see also Gorence v. Eagle Food Ctrs., Inc*., 242 F.3d
749, 762-63 (7th Cir. 2001) ("[A]n amorphous litany of complaints about a myriad of workplace
decisions regarding promotions, salary, etc. does not necessarily meet a plaintiff's burden of
proof.").  The events that Lewis describe have very little to do with race or gender and have
absolutely nothing to do with Serv-All's decision to hire Lawson, rather than Lewis, for the
Sales Manager position and thus shed no light on Boccabella's decision-making process.
*Gorence*, 242 F.3d at 762-63 ("[I]t is simply not true, we want to emphasize, that if a litigant
presents an overload of irrelevant or nonprobative facts, somehow the irrelevancies will add up
to relevant evidence of discriminatory intent.  They do not; zero plus zero is zero.").

In fact, even if a trier of fact were to believe that Boccabella was personally biased
against females or African-Americans, Lewis would still not have a triable issue that her failure
to receive the Sales Manager position was motivated by her gender or race.  The Seventh Circuit
Court of Appeals has stated: "[B]igotry, *per se*, is not actionable.  It is actionably only if it
results in injury to a plaintiff; there must be a real link between the bigotry and an adverse
employment action." *Adams*, 324 F.3d at 939 (citing *Gorence*, 242 F.3d at 762).  Here, when

23

taking the evidence in the light most favorable to Lewis and drawing all reasonable inferences, there is simply no evidence linking Boccabella's alleged bias based on race or gender to Lewis's failure to receive the promotion to Sales Manager. *Id.* Moreover, Lewis has produced no evidence that would call into question Serv-All's legitimate, non-discriminatory reason for selecting Lawson, rather than Lewis, for the relevant position.

In sum, while Lewis has certainly presented a myriad of evidence in an effort to support her claims of gender and racial discrimination, the evidence in aggregate fails to create a "convincing mosaic of discrimination" with respect to Serv-All's decision not to award her the Sales Manager position. *Troupe*, 20 F.3d at 737. Consequently, Lewis's claims will not escape summary judgment under the direct method of proof.

### C. Lewis's Discrimination Claims Also Fail Under the McDonnell Douglas Method

Lewis also advocates her claims of discrimination under the indirect method of proof, that is, the *McDonnell Douglas* framework. (*See* Resp. Br. 9-11.) For purposes of summary judgment, Serv-All concedes that Lewis can establish the first, second, and third elements of her *prima facie* case. (*See* Def.'s Br. in Supp. of Mot. for Summ. J. 24.) However, Serv-All contends that Lewis's claims falter on the fourth element, explaining that Lewis cannot show that Lawson was "similarly or less qualified" than her. *Jordon v. City of Gary, Ind.*, 396 F.3d 825, 833 (7th Cir. 2005).

Here, it is Lewis's burden to establish that Lawson, who, as stated *supra*, has over ten years of experience in outside sales and sales management in the waste industry (*see* Anderson Aff. Def 1 0236), was not better qualified than her. *See McDonnell Douglas*, 411 U.S. at 802 (emphasizing that the plaintiff carries the initial burden of establishing the four elements of a

*prima facie* case of discrimination).  Yet, Lewis, whose outside sales experience consists of two years in a retail clothing store, merely offers her own testimony that she was "at least" as qualified for the promotion as Lawson, which, of course, amounts to nothing more than her own estimation of her qualifications. *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002) ("It is well settled that conclusory allegations . . ., without support in the record, do not create a triable issue of fact.").  In fact, at the Staff interviews, Lewis rated Lawson as "outstanding" in several areas, and she concedes that winning the Chairman's Club Award for outstanding sales is a "very big deal." (Lewis Dep. 80-81, 86-87, Ex. 16.)

Furthermore, even assuming *arguendo* that Lewis was the better candidate for the Sales Manager position and thus that she could establish a *prima facie* case, it ultimately would be of no import.  As concluded *supra* in Section IV.B.3, Lewis cannot establish that Serv-All's reasoning was pretextual, as she has produced no evidence that suggests Serv-All did not honestly believe that Lawson had better qualifications than her for the position. *See Balderston*, 328 F.3d at 323 (stating that the plaintiff's "own belief that [s]he was the best candidate is irrelevant to the question of pretext"); *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 843 (7th Cir. 1996) ("[The plaintiff] must do more than challenge the judgment of her superiors through her own self-interested assertions because the employee's perception of herself . . . is not relevant.  It is the perception of the decision maker which is relevant." (internal quotation marks and citation omitted)).

Therefore, under the *McDonnell Douglas* method, Lewis's claims of gender and racial discrimination ultimately suffer the same fate as under the direct method of proof, and thus they cannot withstand Serv-All's motion for summary judgment.

### D.  Lewis's Argument That Summary Judgment Is Unconstitutional Is Futile

Nonetheless, Lewis, who perhaps foresaw the ultimate fate of her discrimination claims on the merits, lobs a final argument – that summary judgment in and of itself is unconstitutional because the "right to trial by jury is guaranteed by the Seventh Amendment to the United States Constitution." (Resp. Br. 12.)  On that premise, Lewis requests that this Court "decide that summary judgment is unconstitutional and therefore deny Defendant's motion for summary judgment." (Resp. Br. 14.)

Lewis's argument, however, is contrary to the ruling of the United States Supreme Court, who in *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 336 (1979) (citing *Fid. & Deposit Co. of Md. v. United States*, 187 U.S. 315, 319-21 (1902)), stated that filing a lawsuit does not entitle a plaintiff to a trial by jury and that summary judgment does not violate the Seventh Amendment.  Predictably, Lewis's argument is also at odds with the precedent of the Seventh Circuit Court of Appeals, who routinely affirms the district courts' granting of summary judgment to avoid unnecessary trials. *See, e.g.*, *Palucki*, 879 F.2d at 1572-73 ("A district judge faced with such a [summary judgment] motion must decide . . . whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict.  If not, the motion should be granted and the case dismissed."); *Wagoner v. CSX Transp., Inc*., 246 F. Supp. 2d 1002, 1005 (N.D. Ind. 2003) ("'[I]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained' and in such cases summary judgment is appropriate." (quoting *Mason v. Cont'l Ill. Nat'l Bank*, 704 F.2d 361, 367 (7th Cir. 1983))).  Indeed, a significant part of the structure of the federal rules and federal practice, to say nothing of the state court systems, contemplates the

use of summary judgment. *See* Fed. R. Civ. P. 56.

In short, if any court is going to rule that summary judgment is unconstitutional, it will not be this one.  We will leave the issue to the United States Supreme Court to revisit when, and if, it becomes necessary.

## V.  CONCLUSION

For the foregoing reasons, the Defendant's motion for summary judgment (Docket # 25) is GRANTED, and Plaintiff's Motion to Strike (Docket # 36) is DENIED AS MOOT.  The Clerk is directed to enter a judgment in favor of the Defendant and against the Plaintiff.

SO ORDERED.

Enter for December 13, 2007.

S/ Roger B. Cosbey
Roger B. Cosbey
United States Magistrate Judge